978 F.Supp. 1161 (1997)
Kelly MIRACLE, by next friend, Judith A. MIRACLE; F. Lee Miles, on behalf of the Estate of Clayton Miracle; and Judith Miracle and Clayton Miller, the natural parents of Clayton Miracle, Plaintiffs,
v.
Eunice SPOONER, Gail Whitney, Willie Joe Wilkins, and Betty Sue Wilkins, Defendants.
Civil Action No. 1:95-CV-1972-TWT.
United States District Court, N.D. Georgia, Atlanta Division.
September 26, 1997.
*1162 *1163 Larry Kent Butler, Butler & MacDougald, Atlanta, GA, for Kelly Miracle, Judith A. Miracle.
Michael David Gruenhut, Spix, Krupp & Reece, Atlanta, GA, for Clayton Miller.
Stephen Edwin Boswell, Office of Stephen Edwin Boswell, Jonesboro, GA, for Eunice, Spooner, Gail Whitney.

ORDER
THRASH, District Judge.
The Plaintiffs bring this civil rights action under 42 U.S.C. § 1983 seeking damages for the physical injuries (including death of one child) suffered by two children placed in a foster care home.[1] This matter is before the court on the Defendants' Motion for Summary Judgment [51-1] on all of Plaintiffs' claims, Defendants' Motion to Supplement [52-1] their Motion for Summary Judgment, Plaintiffs' Motion to Supplement [63-1] their Response to Defendants' Motion for Summary Judgment, Plaintiffs' Motion to Strike [62-1] the Affidavit of Linda Doster, Plaintiffs' Motion Not to Consider [62-2] the Affidavit, and Plaintiffs' Motion to Supplement the Record [66-1].

I. FACTS

A. Burrow County DFACS Takes Custody of Seven Miracle Children

On February 18, 1993, the Barrow County Department of Family and Children Services ("DFACS") instituted a deprivation proceeding and obtained emergency custody of the seven children of Judith Miracle: Clayton (age 3), Kelly (age 3), Amanda (age 5), Alberta (age 5), Robert (age 2), Samuel (age 1), *1164 and Lizann (age 7).[2] On the basis of reports of heavy drinking, fighting and neglect of the children by their parents, Plaintiffs Judith Miracle and Clayton Miller, Barrow County DFACS petitioned the Barrow County juvenile court for a shelter care order to, obtain emergency custody of the Miracle children. The juvenile court issued the shelter care order and vested custody of the children in the Georgia Department of Human Resources, acting through Farrow County DFACS.
The Barrow County DFACS then initiated additional deprivation proceedings to retain custody of the Miracle children. On February 19, 1993, the juvenile court issued an order appointing a guardian ad litem to represent the interests of the children in the deprivation proceedings. In April 1993, the juvenile court conducted a hearing to decide whether it should continue custody of the Miracle children with Barrow County DFACS. On April 20, 1993, the juvenile court issued an order in which it found that the children were deprived, in need of protection and that remaining in the home of their parents would have been contrary to their welfare. Accordingly, the juvenile court ordered that custody of the children be continued in and vested in Barrow County DFACS.

B. DFACS Places the Miracle Children in Foster Homes

In February, 1993, the Miracle children were placed in temporary foster homes. When Barrow County DFACS obtained custody of the Miracle children, DFACS caseworker Eunice Spooner was assigned to handle their cases. Defendant Spooner was not responsible for selecting the foster parents. Her duties did include physically placing foster children in their assigned foster homes and monitoring the placement thereafter. The Defendant Gail Whitney was Eunice Spooner's supervisor. Defendant Whitney was responsible for, among other things, approving the selection of foster parents and supervising caseworkers.
In June, 1993, the Barrow County DFACS placed Clayton Miracle and Kelly Miracle in the home of the Defendants Willie Joe and Betty Sue Wilkins. On August 9, 1993, Clayton was brutally beaten for soiling his pants. He was hospitalized in a coma and died the following day. An autopsy and police examination of Clayton's body showed that the child had sustained many wounds. It appeared that many of the wounds were inflicted with a fly swatter. These wounds were as old as four weeks before and as fresh as twenty-four hours before his death. DFACS immediately took Kelly from the Wilkins home. The Plaintiffs contend that Kelly also was abused while she was with the Wilkinses. The Defendant Willie Joe Wilkins was subsequently charged with and convicted of the murder of Clayton Miracle. He currently is serving a sentence of seven years in prison.
The rules of DFACS required Defendant Spooner, like all caseworkers dealing with foster children, to make at least one "face-to-face" visit a month with each foster child that she supervised. At the time of Clayton Miracle's death, there was no record in the case file that she had made any of the required visits with Clayton or Kelly during the entire time they were in foster care. Following Clayton's death, Defendant Spooner attempted to bring her five months of case notes and records of contacts up to date by creating records of visits on June 29, and July 22, 1993 to the Wilkins home. Defendant Spooner later admitted that the record of a July 22, 1993 visit to the Wilkins home was a fabrication. The Plaintiffs claim that Defendants Spooner and Whitney concocted a scheme to fabricate the record of a July 22, 1993 home visit in order to show compliance with the DFACS rules requiring monthly face-to-face contacts. The Defendants Spooner and Whitney later were indicted and tried for falsifying official records. Defendant Spooner was convicted, but Defendant Whitney was acquitted.
As noted above, the police and autopsy investigation following Clayton Miracle's death revealed that several wounds and bruises on his body were as old as four *1165 weeks. A jury could conclude that Defendant Spooner would have seen evidence of physical abuse of Clayton if she had made the required face to face contact in July, 1993. If the severe physical abuse had been discovered, it is reasonable to conclude that DFACS would have removed the children from the Wilkins home before the murder of Clayton Miracle.
The Plaintiffs claim that the selection of the Wilkinses as foster parents and the Defendants' failure to monitor adequately Clayton and Kelly's placement with the Wilkinses violated rights protected by 42 U.S.C. § 1983. The Plaintiffs also claim that the Defendants Willie Joe and Betty Sue Wilkins violated the constitutional rights of Clayton and Kelly Miracle by repeatedly subjecting them to physical and psychological abuse. These Defendants never filed answers in this action and the Court ordered that entries of default be made as to these Defendants on May 22, 1996.

1. DFACS's Screening of the Defendant Wilkinses

As is true with all foster parents, DFACS required the Wilkinses to take training classes before children were placed in their home. The training, called the Model Approach to Partnerships in Parenting ("M.A.P.P."), consisted of ten sessions designed to sensitize foster parent candidates to the behavior of children and instruct them on appropriate discipline. During their M.A.P.P. training, the DFACS employee responsible for training the Wilkinses identified only two issues of concern: (1) the fact that Ms. Wilkins was once in foster care herself; and (2) Ms. Wilkins' prior divorce. DFACS personnel discussed these issues with the Wilkinses during required family consultations, and concluded that they did not create any concerns that would preclude approval of the Wilkinses as foster parents.
The Plaintiffs allege that DFACS performed an inadequate background check on the Wilkinses before placing Clayton and Kelly Miracle in their care. The Plaintiffs note that DFACS officials were aware of unresolved traffic violations regarding Mr. Wilkins, but were not aware of other DUI offenses, including a felony habitual offender conviction in the mid-1980s. The DFACS Defendants argue, however, that they relied on the Barrow County Sheriff's Department to perform a criminal records check. The Sheriff's Department notified DFACS only of traffic offenses in 1979. The Defendants admit no further records check was performed, but contend that they had no reason to suspect that any further record check was necessary.
The Plaintiffs argue that DFACS officials did not interview any of the Wilkinses' neighbors before placing Clayton and Kelly in their home. It is undisputed that DFACS contacted only three individuals  all listed as references by the Wilkinses  in connection with their selection as foster parents. The Plaintiffs argue that interviews with the Wilkinses' neighbors would have uncovered allegations that Mr. Wilkins often exposed his genitalia to women in the neighborhood and masturbated in front of these women while standing in a window in the Wilkins home. This alleged practice continued even after Clayton and Kelly were placed in their home. The Plaintiffs also argue that additional interviews with Ms. Wilkins' relatives, including her own brother, would have revealed opinions that Ms. Wilkins was a mean, vicious, overbearing person.

2. DFACS's Monitoring of the Defendant Wilkinses

The Plaintiffs also claim that Defendants Spooner and Whitney inadequately monitored Clayton and Kelly's situation once they were placed with the Wilkinses. The Plaintiffs claim that Defendant Spooner failed to make her required contacts with Clayton and Kelly Miracle and that she failed to return numerous phone calls from the Wilkinses.
Generally, DFACS requires case workers to have at least one face-to-face contact per month with each foster child. The DFACS Foster Care Manual provided as follows: "A child in Family Foster Care, including REL, shall have at least one face-to-face contact each month with the Services Worker unless the child is in long-term foster care." The Wilkinses were first time foster parents. Under DFACS regulations in effect in 1993, *1166 first time foster parents required greater supervision than more experienced foster parents normally required. DFACS rules also provide that a child initially placed in foster care or being placed in another foster home will require more frequent contacts than other children. The number of contacts each month will vary depending on the needs of the child and the foster parent.
In her deposition, Defendant Spooner acknowledged her duty to make monthly face-to-face contacts and the special needs of the Miracle children. She testified as follows:

 Question: You might not have gone a
 month and a half without doing
 a home visit [if you had known
 there was resentment, violence,
 and rage in Betty Wilkins'
 home when she was a child];
 right?
 Spooner: Again, when you're required to
 do one a month and you have 20
 kids and everything else, I
 talked to her or the phone, and I
 had no reason to think she
 wasn't honest with me.
 ....
 Question: [And] you are the one that went
 without making the home visit;
 right?
 Spooner: Yes.
 Question: You are the one that lied in the
 official record and concocted the
 home visit that you felt you
 should have made; right?
 Spooner: Yes

She also testified as follows:

 Question: So what you're saying is the
 Miracle Children needed extra
 attention?
 Spooner: Very extra attention in every
 aspect you can think of.
 Question: Certainly more than the average
 children?
 Spooner: Correct
 Question: And as the average children in
 your caseload, they deserved
 and needed more attention; is
 that right?
 Spooner: Yes. But every child who comes
 in care have [sic] very special
 needs or they wouldn't be in
 care.
 Question: I understand, and we've gone
 over that. But these were extraordinarily
 needy children?
 Spooner: I think so, in the fact, yes....

Despite the DFACS regulations that required her to make at least one home visit per month and the DFACS regulations requiring extra visits when a child initially is placed with specific foster parents and her own recognition of the special needs of Clayton and Kelly, Defendant Spooner made only one home visit during the entire two month period  from June 9, 1993 to August 9, 1993  that Clayton and Kelly were in the Wilkins home. This one home visit on June 29, 1993, was Defendant Spooner's only face-to-face visit with Clayton while he was in the Wilkins home. In July, Defendant Spooner had a second face-to-face visit with Kelly at a physician's office where Kelly was being treated for problems related to her tonsils. On that occasion, Kelly's physician reported no evidence of physical abuse.
There is also testimony in the record that Defendant Spooner failed to return phone calls from the Wilkinses regarding problems they were having with the children. Her case notes show that she had six telephone contacts with the Wilkinses (five of them concerning Kelly's medical concerns). She does not recall whether she prepared these case notes contemporaneously with the telephone contacts, or whether she prepared them after Clayton's death. In his deposition, Mr. Wilkins testified that he and Ms. Wilkins realized almost immediately that they were incapable of handling Clayton and Kelly. He testified that he and his wife attempted to contact Defendant Spooner repeatedly, but that she refused to return their telephone calls.[3]
*1167 Finally, the Plaintiffs claim that Defendant Spooner's one home visit to the Wilkins home on June 29 should have alerted her to the risk of physical harm to Clayton and Kelly. It is undisputed that during this home visit Defendant Spooner observed bruises on both Clayton and Kelly. She accepted the explanation that the bruises were the result of bicycle falls. The Plaintiffs point cut that the only bicycle on the Wilkinses' property was a twenty-four-inch boy's bicycle with a raised horizontal bar that belonged to the Wilkinses' eight year old son. The Plaintiffs argue that Clayton and Kelly, three years old at the time, were not big enough to ride this bicycle. Defendant Spooner also admitted in her deposition that she learned during the June 29, 1993 home visit that Betty Sue Wilkins on at least one occasion placed Clayton under a cold shower in an effort to control a tantrum. Earlier in her deposition Defendant Spooner stated that using cold showers to punish a child would be child abuse and denied any knowledge that the Wilkinses were using cold showers to discipline the children. Her case record does contain a note describing the incident when Ms. Wilkins took Clayton Miracle into a cold shower to deal with a tantrum.[4]

II. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment may be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." The moving party must show the court that no genuine issue of material fact remains to be decided at trial. Haves v. City of Miami, 52 F.3d 918, 920 (11th Cir.1995); Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-09 (11th Cir.1991). All evidence and factual inferences are to be viewed in a light most favorable to the nonmoving party. Rollins v. TechSouth, Inc., 833 F.2d 1525, 1529 (11th Cir.1987); Everett v. Napper, 833 F.2d 1507, 1510 (11th Cir. 1987). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." Id. at 250, 106 S.Ct. at 2511. A mere scintilla of evidence is insufficient to create a jury question; rather, there must be conflict in substantial evidence to create a question for the jury. Id., 477 U.S. at 252, 106 S.Ct. at 2512; Gordon v. E.L. Hamm & Associates, Inc., 100 F.3d 907, 910 (11th Cir.1996). Similarly, a fact is not material unless it is identified by the controlling substantive law as an essential element of the nonmoving party's case. Anderson v. Liberty Lobby, 477 U.S. at 248, 106 S.Ct. at 2510.
Where there is an absence of evidence either proving or disproving an essential element of a claim, the movant meets its burden on summary judgment by stating that the opposing party will not be able to meet its burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553-54, 91 L.Ed.2d 265 (1986). In Celotex, the Supreme Court interpreted Federal Rule of Civil Procedure 56(c) to require the moving party to show that the nonmoving party lacks evidence to support an essential element of its claim. Thus, the movant's burden is "discharged by `showing'  that is, pointing out to the district court  that there is an absence of evidence to support the nonmoving party's case." Id.

III. DISCUSSION

Before reaching the merits of the Plaintiffs' claims, the Court must address numerous issues regarding whether the proper parties *1168 have brought certain claims in this action and whether the applicable statute of limitations bars certain claims.

A. Judith Miracle's and Clayton Miller's Right to Sue as Next Friend of Kelly Miracle

The Defendants contend that Plaintiffs Judith Miracle and Clayton Miller are not appropriate parties to bring the claims in this action on behalf of Kelly because their parental rights have been terminated. However, it appears to the Court that the Plaintiffs Miracle and Miller are not bringing their own claims based upon their parental relationship with Kelly, but are rather bringing Kelly's claims as next friends of Kelly. In other words, the cause of action and any subsequent relief will belong to Kelly, not Plaintiffs Judith Miracle and Clayton Miller. They are only the vehicle through which Kelly asserts her claims. Because the Court has not been presented with any evidence that Kelly is prejudiced by the assertion of her claims though the Plaintiffs Miracle and Miller, the Court rejects the Defendants' claim that the Plaintiffs Judith Miracle and Clayton Miller are precluded from asserting the claims made on behalf of Kelly Miracle.

B. Application of the Statute of Limitations to Clayton Miller's Claims

The Defendants contend that the statute of limitations bars Plaintiff Clayton Miller's claims because he intervened in this action more than two years after his cause of action accrued. The statute of limitations for a wrongful death action under state law is two years. O.C.G.A. § 9-3-33. It is well settled in this circuit that the appropriate statute of limitations to apply to a section 1983 claim is the two year period contained in O.C.G.A. § 9-3-33. Rozar v. Mullis, 85 F.3d 556, 561 (11th Cir.1996); Hill v. Metropolitan Atlanta Rapid Transit Auth., 841 F.2d 1533, 1545 (11th Cir.1988); Lawson v. Glover, 957 F.2d 801, 803 (11th Cir.1987). It is undisputed that the injuries to Clayton and Kelly Miracle occurred on or before August 10, 1993. Clayton Miller did not file his motion to intervene until January 11, 1996. Therefore, the statute of limitations bars any claims by Mr. Miller in his individual capacity under state or federal law for the death of Clayton Miller.

C. Plaintiff Miracle's Parental Rights Not Terminated As to Clayton

The Defendants also contend that Plaintiff Judith Miracle cannot recover for the wrongful death of Clayton because her parental rights have been terminated. However, the petition to terminate the Plaintiff Miracle's parental rights did not terminate her parental rights with respect to Clayton. Both the petition for termination of parental rights and the juvenile court order terminating Plaintiff Miracle's parental rights fail to mention Clayton's name. Clayton Miracle was deceased at the time the petition was filed. Therefore, Plaintiff Judith Miracle is not precluded from maintaining her federal and state claims based on the wrongful death of Clayton Miracle due to the termination of her parental rights with respect to the other children.

D. Plaintiffs' Substantive Due Process Claims

In Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) the Supreme Court held that a state official's deliberate indifference to an inmate's serious medical needs violated the Eighth Amendment. In Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Supreme Court expanded Estelle and recognized a liberty interest in a person involuntarily committed to the government's custody. In Youngberg, the Supreme Court held that the substantive component of the Due Process Clause requires the State to provide involuntarily committed mental patients with such services as are necessary to ensure their "reasonable safety" from themselves and others. The Youngberg Court concluded that "if it is cruel and unusual to hold convicted criminals in unsafe conditions, it must be unconstitutional [under the due process clause] to confine the involuntarily committed  who may not be punished at all  in unsafe conditions." Id. at 315-16, 102 S.Ct. at 2458. Finally, in DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, *1169 199, 109 S.Ct. 998, 1005, 103 L.Ed.2d 249 (1989), the supreme Court held that "when the state takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." Id. at 199-200, 109 S.Ct. at 1005. The Court summarized its holdings in Estelle and Youngberg, as follows:
In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf  through incarceration, institutionalization, or other similar restraint of personal liberty  which is the deprivation of liberty triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.
Id. at 200, 109 S.Ct. at 1006. The relationship between the states and the plaintiffs in Estelle, Youngberg, and later cases has come to be known as "special relationships." See e.g., Wooten v. Campbell, 49 F.3d 696, 701 (11th Cir.1995) ("The state did not restrain Daniel's freedom or hold him against his will to such an extent that a special relationship' was created.")
The principles enunciated in this series of cases were applied to children in foster care by the Eleventh Circuit Court of Appeals in Taylor By and Through Walker v. Ledbetter, 818 F.2d 791 (11th Cir.1987) (en banc). It held that "a child involuntarily placed in a foster home is in a situation so analogous to a prisoner in a penal institution and a child confined in a mental health facility that the foster child may bring a section 1983 action for violation of Fourteenth Amendment rights." Id. at 797. The court compared the facts of Taylor to Youngberg, stating that "[i]n both cases, the state involuntarily placed the person in a custodial environment, and in both cases, the person is unable to seek alternative living arrangements." Id. at 795. In summary, the court held:
In this case, the child's physical safety was a primary objective in placing the child in the foster home. The state's action in assuming the responsibility of finding and keeping the child in a safe environment placed an obligation on the state to insure the continuing safety of that environment. The state's failure to meet that obligation, as evidenced by the child's injuries, in the absence of overriding societal interests, constituted a deprivation of liberty under the fourteenth amendment.
Id.
The Defendants contend that the parents of the Miracle children consented to the State's retaining custody of the Miracle children and, therefore, the Miracle children were voluntarily placed into foster care. They argue that the rule set forth in Taylor does not apply to children who are voluntarily in the state's custody.[5] In Taylor, it appears that the parents did not consent to placement of the child in foster care. In that sense, it can be said that the child was in state custody involuntarily from the perspective of both the child and the parents. However, the analysis in Taylor does not suggest that parental consent the duty owed by the state to the child once the child is placed in foster care. The court described the foster care environment as follows:
Children in foster homes ... are isolated; no persons outside the home setting are present to witness and report mistreatment. The children are helpless. Without the investigation, supervision, and constant contact required by statute, a child placed in a foster home is at the mercy of the foster parents.
Taylor, 818 F.2d at 797. This description of foster care applies whether or not the natural parents consented to placement of the children into the foster care home. Without the protection of the state, a child who is in foster care is at the mercy of the foster parents whether or not its natural parents consented to the placement of the child into foster care. From the child's point of view, foster care will always constitute involuntary *1170 custody because the state does not give the child an alternative to the foster home the state has chosen. Accordingly, the Court finds that the state's duty of care recognized in Taylor applies in this case notwithstanding the parents's consent to placement of the children into foster care.
Having concluded that the Miracle children are entitled to the protections set forth in Taylor, this Court now turns to the question of whether there are sufficient facts for a reasonable jury to hold the DFACS Defendants liable according to the Taylor analysis. The Eleventh Circuit held that a foster child cannot prevail in a section 1983 action against state officials based on incidental injuries or infrequent acts of abuse.
Not ... every child in foster care may prevail in a section 1983 action against state officials based on incidental injuries or infrequent acts of abuse; only where it is alleged and the proof shows that the state officials were deliberately indifferent to the welfare of the child will liability be imposed.
Taylor, 818 F.2d at 797. Thus, to show that the Defendants deprived Clayton and Kelly Miracle of liberty interests, the Plaintiffs must show that the Defendants were deliberately indifferent to their welfare. Id. In Taylor, the Eleventh Circuit did not describe in detail the ways deliberate indifference can be shown in this context, but merely stated that Plaintiffs must show "actual knowledge of abuse or that agency personnel deliberately failed to learn what was occurring in the foster home." Id., at 796. The court in Taylor found the complaint in that case sufficient to state a claim of deliberate indifference where the plaintiff alleged that the defendants: "(1) failed to thoroughly investigate the fitness of the foster home; (2) knew or should have known the foster parents were unfit to be trusted with [the plaintiff's] care, custody, and supervision; (3) failed to maintain proper supervision in inspection of the foster home; and (4) failed to obtain complete physical and medical records, or to furnish available records to the foster parents." Id. at 793.
In the instant case, the Plaintiffs contend that the actions of the DFACS Defendants parallel those alleged in Taylor. The Plaintiffs claim that the DFACS Defendants (1) failed to screen or investigate adequately the Defendant Wilkinses before determining that they were fit to be foster parents; and (2) that the DFACS Defendants failed to supervise and inspect adequately the foster care environment once Clayton and Kelly Miracle were placed in the Wilkinses' care.

1. Failure to Screen Foster Parents Properly

As an initial matter, the Court notes that the Plaintiffs have not sued the persons who screened or investigated the Wilkinses before their selection as foster parents. Defendants Spooner and Whitney were not involved in the screening, training, or investigation of foster parent applicants. Defendant Spooner was a case worker whose responsibilities included only monitoring foster children after they have been placed with foster parents. The Defendant Whitney's duties involved her in the approval of foster parents. However, she had no responsibility to perform the actual screening or investigating of foster parents. Her recommendation for approval of a foster parent was based entirely upon materials and recommendations presented to her after all screening procedures were complete. Nothing in the Wilkinses' application materials would have alerted Defendant Whitney that the Wilkinses were not fit to be foster parents. For these reasons, the Court finds that there is no genuine issue of material fact as to the Plaintiffs' claims that these named Defendants failed to screen adequately the Wilkinses before determining they were fit to become foster parents.

2. Failure to Supervise the Foster Parents

a. Defendant Spooner

The undisputed evidence shows that DFACS regulations require as a general matter that caseworkers make at least one face-to-face contact per month with the foster children for whom they are responsible. The regulations also state that when foster children are initially placed in a foster care home they may require more contacts depending *1171 on the needs of the child and the foster parent. In her deposition, Defendant Spooner admits that both Clayton and Kelly were extraordinarily needy and required "very extra attention." Defendant Spooner also knew that the Wilkinses were first time foster parents.
Defendant Spooner made only one home visit during the entire two month period  from June 9, 1993 to August 9, 1993  that Clayton and Kelly were in the Wilkins home. This home visit on June 29, 1993, was her only face-to-face contact with Clayton the entire time he was in the Wilkins home. She had one additional face-to-face visit with Kelly in July 1993 at a physician's office. Her case notes reflected six telephone contacts (five concerning Kelly) during July 1993. However, Defendant Spooner does not recall whether she prepared these case notes contemporaneously with the alleged phone contacts, or whether she prepared them after Clayton's death, at the time when she fabricated the record of a July 22, 1993 home visit.
During the one home visit Defendant Spooner actually made on June 29, 1993, she observed bruises on Clayton and Kelly. She was told that the bruises were the result of bicycle falls although the only bicycle on the premises was too large for either Clayton or Kelly. Also during this visit Defendant Spooner learned that Betty Sue Wilkins subjected Clayton to cold showers as a method of discipline. Defendant Spooner admitted that this was inappropriate, and probably child abuse, but did nothing to remove Clayton and Kelly from the home and did not even report the practice. Finally, in his deposition, Mr. Wilkins testified that he and his wife realized almost immediately that they could not meet the needs of Clayton and Kelly. He testified that he and his wife repeatedly attempted to contact Defendant Spooner to discuss this but that she failed to return any of their phone calls.
The Defendants admit that Defendant Spooner failed to make her required face-to-face contact with Clayton during July 1993. However, in response to this and the Plaintiffs' other evidence that Defendant Spooner had become inaccessible to many foster parents, the Defendants have presented evidence that Defendant Spooner had a high caseload and other demands which distracted her from her normal duties. The Defendants assert that this shows that Defendant Spooner was, at most, negligent and was not deliberately indifferent to Clayton and Kelly. The Plaintiffs, on the other hand, contend that she was responsible for a low number of foster children and that her caseload was made even lighter by the fact that seven of her foster children were with one family. While this evidence is relevant to the issue of deliberate indifference, it does not compel a finding one way or the other. In the fact of conflicting evidence it is for the jury to determine whether, under all the circumstances, Defendant Spooner exhibited deliberate indifference to the welfare and safety of the Miracle children in the Wilkins home.
Viewing the evidence in the light most favorable to the Plaintiffs, the Court finds that a reasonable jury could find that Defendant Spooner exhibited deliberate indifference to the rights of Clayton and Kelly Miracle. A reasonable jury could find that she left the Wilkinses virtually unsupervised and unguided  failing to make the required contacts, failing to return phone calls, and failing to report her knowledge of at least one practice she believed constituted child abuse. Therefore, the court finds that there is a genuine issue of material fact as to whether Defendant Spooner exhibited deliberate indifference to the welfare of Clayton and Kelly Miracle sufficient to authorize the award of damages pursuant to 42 U.S.C. § 1983.

b. Defendant Whitney

Regarding Defendant Whitney, the Plaintiffs have failed to present sufficient evidence to create a jury issue as to whether the she was guilty of deliberate indifference to Clayton and Kelly Miracle's welfare. Liability under section 1983 must be predicated upon more than a theory of respondeat superior. Monell v. Department of Social Services, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); Hill v. Dekalb Regional Youth Detention Ctr., 40 F.3d 1176, 1196 (11th Cir.1994); Belcher v. City of Foley, Alabama, 30 F.3d 1390, 1396 (11th Cir. 1994); Vineyard v. County of Murray, Georgia, *1172 990 F.2d 1207, 1211 (11th Cir.1993). To state a claim under section 1983, the Plaintiffs must show that Defendant Whitney was personally involved in the alleged injuries the Plaintiffs suffered or that she was responsible for the execution of some official policy or custom that resulted in the violation of the Plaintiffs' constitutional rights. Monell, 436 U.S. at 690-91, 98 S.Ct. at 2035-36; Ort v. Pinchback, 786 F.2d 1105 (11th Cir.1986).
The evidence here shows only that Defendant Whitney had knowledge of (a) the fact that Defendant Spooner failed to return phone calls to several foster parents for whom she was responsible and (b) that Defendant Spooner failed to turn in her records of home visits in a timely fashion. However, the Plaintiffs have failed to present any evidence that Defendant Whitney had (a) knowledge of the conditions in which Clayton and Kelly were living, (b) knowledge of bruises, or (c) knowledge of practices, i.e., cold showers as punishment, which could be considered child abuse. Further, the Plaintiffs have failed to present any evidence that Defendant Whitney had any knowledge that Defendant Spooner was aware of any of these facts.
In support of their contentions that Defendant Whitney exhibited deliberate indifference to Clayton's and Kelly's welfare, the Plaintiffs argue that Defendant Whitney conspired with Defendant Spooner to falsify certain records after Clayton's death. Assuming arguendo that the Plaintiffs' allegations are true, they are, without more, insufficient to show that Defendant Whitney exhibited deliberate indifference to Clayton's and Kelly's welfare when they were in the custody of the Wilkinses. Any alleged conspiracy to falsify records could not have proximately caused Clayton or Kelly to be deprived of any liberty interests after they had already been removed from the Wilkins home.
In sum, the Plaintiffs' evidence at most shows that Defendant Whitney negligently supervised Defendant Spooner. However, the Supreme Court and the Eleventh Circuit have held that a showing of negligence, even gross negligence, is not sufficient to show deliberate indifference. See Farmer v. Brennan, 511 U.S. 825, 835-36, 114 S.Ct. 1970, 1977-78, 128 L.Ed.2d 811 (1994); Cottrell v. Caldwell, 85 F.3d 1480, 1490-91 (11th Cir. 1996). Therefore, Defendant Whitney is entitled to summary judgement as to the Plaintiffs' substantive due process claim.

E. Plaintiffs' First Amendment Access to The Courts Claim

The Plaintiffs contend that the alleged conspiracy of Defendants Spooner and Whitney to falsify records violated the Plaintiffs' rights of access to the courts. See generally Bounds v. Smith, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). The Plaintiffs do not contend that the alleged conspiracy prevented them from filing a law suit, which they obviously have, or that the alleged conspiracy caused them to miss some filing deadline. The Plaintiffs do claim that the alleged conspiracy delayed the Plaintiffs' discovery of evidence in support of their due process claims. The Plaintiffs contend that this is sufficient to state a claim for denial of access to the courts.
In Lewis v. Casey, ___ U.S. ___, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996), the United States Supreme Court held that a plaintiff must show actual injury to sustain a claim for denial of access to the courts. Id. at ___ -___, 116 S.Ct. at 2179-80. In Lewis, the Supreme Court equated a showing of actual injury to some identifiable harm or prejudice suffered by the plaintiff. Id. at ___, 116 S.Ct. at 2180. The Court stated that a plaintiff might show, "for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement ... [o]r that he had suffered arguable actionable harm that he wished to bring before the courts, but ... was unable even to file a complaint." Id.
The Plaintiffs cite several cases they contend stand for the proposition that conduct by state actors that delays the bringing of a law suit violates the right of access to the courts. See Bell v. City of Milwaukee, 746 F.2d 1205, 1261 (7th Cir.1984); Ryland v. Shapiro, 708 F.2d 967, 974 (5th Cir.1983); Lamar v. Steele, 693 F.2d 559, 562 (5th Cir. 1982). In the context of this case, the Plaintiffs appear to argue that a delay in bringing a law suit is, by itself, actual harm or prejudice. *1173 However, the cases the Plaintiffs cite do not support this argument.
In Bell, for example, the Seventh Circuit held that the defendants' concealment of evidence in that case constituted denial of access to the courts because the defendants' concealment of the evidence rendered hollow the plaintiff's right to seek redress in the state courts via a wrongful death action. Bell, 746 F.2d at 1261. The defendants' concealment of evidence effectively kept from the plaintiff certain facts central to his wrongful death action. Id. The wrongful death action subsequently was dismissed after a settlement dispute and the plaintiff obtained no relief. Therefore, the plaintiff in Bell made a showing of actual injury for purposes of his access to the courts claim. Id. at 1223. Similarly, the Fifth Circuit in Ryland held that the plaintiff's complaint stated a claim for wrongful interference with access to the courts where the defendants had concealed evidence and thereby delayed the plaintiffs' filing a cause of action. Ryland, 708 F.2d at 969-70.
Every court that has applied Lewis has held that a plaintiff must show, for example, that the defendant prevented him from bringing some non-frivolous claim or that, for some reason owing to state action, a court dismissed the plaintiff's claim because he failed to satisfy some technical requirement. See, e.g., Oliver v. Fauver, 118 F.3d 175, 177-78 (3d Cir.1997); Myers v. Hundley, 101 F.3d 542, 544 (8th Cir.1996); Penrod v. Zavaras, 94 F.3d 1399, 1403 (10th Cir.1996); Pilgrim v. Littlefield, 92 F.3d 413, 416 (6th Cir.1996). Here, Plaintiffs fail to present any evidence of actual injury. The alleged conspiracy to falsify documents did not prevent Plaintiffs from bringing any claims, has not caused any claim to be rejected, and has not impeded Plaintiffs' efforts at redress. The fact that the Plaintiffs maintain this action without any deleterious effects emanating from the Defendants' alleged conspiracy defeats Plaintiffs' claim. For the foregoing reasons, the Defendants are entitled to summary judgment with respect to Plaintiffs' claims regarding denial of access to the courts.

F. Plaintiffs' Conspiracy Claims

The Plaintiffs also allege that the Defendants 1) conspired to violate their rights to substantive due process and 2) conspired to violate their rights to access of the courts. The sine qua non of any conspiracy claim is an agreement to accomplish some end. See NAACP v. Hunt, 891 F.2d 1555, 1563 (11th Cir.1990) ("[Plaintiff] must show that the parties `reached an understanding' to deny the plaintiff his or her rights ... [and] prove an actionable wrong to support the conspiracy."); Strength v. Hubert, 854 F.2d 421, 425 (11th Cir.1988) (same). The Plaintiffs' claims of conspiracy are unsupported by any evidence of any agreement, tacit or otherwise, between the Defendants to place Clayton and Kelly Miracle at risk in any way. No evidence exists of any agreement or understanding to place Clayton in a situation where he was likely to be killed.
A review of the record reveals that the Plaintiffs' second conspiracy claim also is without merit. First, no evidence exists that the Defendants Spooner and Whitney agreed to falsify records. Further, the Plaintiffs have failed to present any evidence from which a reasonable jury could find that Defendant Whitney knew that Defendant Spooner had falsified her notes. The Plaintiffs' sole evidence of conspiracy is that Defendant Whitney made editing marks and alterations on handwritten notes prepared by Defendant Spooner. However, in her deposition, Defendant Whitney testifies, and the Plaintiffs do not refute, that she always edited her caseworkers' notes.
Moreover, even assuming arguendo Defendants Spooner and Whitney conspired to falsify records, no evidence exists that they conspired to deprive the Plaintiffs any of their constitutional rights, i.e., the Plaintiffs' rights of access to the courts, or that the Defendants' conspiracy resulted in the violation of any of the Plaintiffs' rights. See Lowe v. Aldridge, 958 F.2d 1565 (11th Cir. 1992) (stating that plaintiff must show that the defendants conspired to deny plaintiff his or her rights); see also Hunt, 891 F.2d at 1563 (same). Accordingly, the Defendants are entitled to summary judgment on the Plaintiffs' claims that the Defendants conspired *1174 to violate their rights of access to the courts.

G. Qualified Immunity

In addition to denying substantive liability, the DFACS Defendants assert that they are immune from all of the Plaintiffs' claims against them in their individual capacities based on the doctrine of qualified immunity. The Court now considers whether Defendant Spooner is entitled to qualified immunity from the Plaintiffs' substantive due precess claims against her in her individual capacity.[6]
Qualified immunity protects section 1983 defendants from individual liability for harms arising from the defendant's discretionary acts if the act did not violate any clearly established statutory or constitutional rights of the section 1983 plaintiff of which a reasonable parson would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The Eleventh Circuit employs a two-part test to decide the applicability of qualified immunity to a given set of facts. The first inquiry addresses whether the section 1983 defendant was acting within the scope of his discretion. The second inquiry is whether the section 1983 defendant violated a clearly established right. Lassiter v. Alabama A & M Univ., 28 F.3d 1146, 1149 (11th Cir.1994).
To determine whether a defendant violated a clearly established right, the test is not whether the defendant subjectively believed his actions to be lawful, but whether a reasonable official in the defendant's position should have known that his acts violated clearly established statutory or constitutional rights at the time the defendant acted. Rodgers v. Horsley, 39 F.3d 308 (11th Cir. 1994); Lassiter v. Alabama A & M Univ., 28 F.3d 1146 (11th Cir.1994). "[I]n light of preexisting law, the unlawfulness must be apparent." Hartsfield v. Lemacks, 50 F.3d 950, 955 (11th Cir.1995). The Eleventh Circuit recently held that the defense of qualified immunity applies unless it is clear that the actions involved violated federal law.
For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances. Public officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases. If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant.
Williamson v. Mills, 65 F.3d 155, 157 (11th Cir.1995) (internal quotation marks omitted). The Eleventh Circuit thus recently reaffirmed that if case law has not staked out a bright line, qualified immunity protects the defendant.
In this case, the Court finds that Defendant Spooner is not entitled to qualified immunity as to Plaintiffs' substantive due process claims against her. It has been clearly established since at least 1987, when the Eleventh Circuit decided Taylor v. Ledbetter, 818 F.2d 791 (11th Cir.1987), that deliberate indifference to the welfare of a foster child is a violation of federal law actionable under 42 U.S.C. § 1983. Therefore, the defense of qualified immunity does not apply if the jury finds that Defendant Spooner was guilty of deliberate indifference to the welfare of the Miracle children in their assigned foster home.
The Defendants argue that in 1993 it was not clearly established that a child voluntarily placed in foster care has a liberty interest protected by the Fourteenth Amendment's Due Process Clause. As discussed above, Taylor imposes a duty on the state to protect the children in its care whether or not the *1175 parents consent to placement in foster care. Moreover, the Consent Decree entered in the record following the Taylor decision clearly shows that DFACS was aware of this duty. The Consent Decree states that it is DFACS' goal "that: all children shall be protected from harm while in ... custody," and that DFACS would adopt standards, practices and procedures to further that goal. These procedures were to apply equally "to all minor children" who might be placed in foster homes. The Consent Decree goes on to list these standards, practices and procedures, such as the once a month face-to-face visit requirement. In the face of this language, it strains belief for the Defendant to claim that, in 1993, reasonable foster care workers believed that they had a greater duty to protect some foster care children from abuse based upon whether or not the child's parents had voluntarily allowed the state to place the child in the foster care program. The duty is the same, just as the state's duty to a prisoner is the same whether he pleaded guilty or was convicted after a trial.

H. Plaintiffs' State Law Claims

The Defendants also contend that all of Plaintiffs' claims under state law against the State of Georgia and its officers are subject to dismissal based on sovereign immunity. Sovereign immunity is not merely a defense to liability. See Kelleher v. State, 187 Ga.App. 64, 65, 369 S.E.2d 341 (1988). Rather, under Georgia law, as with qualified immunity from federal claims, "[t]he entitlement is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Griesel v. Hamlin, 963 F.2d 338, 340 (11th Cir.1992). Under the doctrine of sovereign immunity, "the state cannot be sued without its consent." State Bd. of Educ. v. Drury, 263 Ga. 429, 430, 437 S.E.2d 290 (1993). The question whether a state is entitled to immunity is a question of law to be decided by the court. See Keenan v. Plouffe, 267 Ga. 791, 482 S.E.2d 253 (1997).
In 1990, the citizens of the state of Georgia voted to limit the authority of Georgia courts to adjudicate actions against the state and its employees. The citizens approved an amendment to the Georgia Constitution that provided as follows:
Except as specifically provided by the General Assembly in a State Tort Claims Act, ... officers and employees of the state or its departments and agencies shall not be subject to suit or liability, and no judgment shall be entered against them, for the performance or nonperformance of their official functions.
Ga. Const, art. I., § II, ¶ IX(d). As contemplated in the amendment, the Georgia General Assembly passed the Georgia Tort Claims Act, O.C.G.A. § 50-21-20 et seq. The Act provides that it is the exclusive remedy for any tort committed by a state officer or employee, as follows:
This article constitutes the exclusive remedy for any tort committed by a state officer or employee. A state officer or employee who commits a tort while acting within the scope of his or her official duties or employment is not subject to lawsuit or liability therefor.
O.C.G.A § 50-21-25(a). The evidence is clear that the DFACS Defendants were acting within the scope of their official duties in the placement and supervision of the Miracle children in the Wilkins home. Thus, the DFACS Defendants are entitled to official immunity for acts committed in performing their official functions.

I. Plaintiffs' Motion to Strike the Affidavit of Linda Doster

Plaintiffs move to strike the affidavit of Linda Doster based on Plaintiffs' belief that the Defendants are offering Ms. Doster as an expert witness. Plaintiffs contend that the Defendants have not complied with the rules for identifying an expert. However, the Defendants rely on Ms. Doster as a fact witness, and not as an expert witness. Thus, the Court DENIES Plaintiffs' Motion to Strike. In the alternative, Plaintiffs request the Court not to consider the Doster affidavit because it violates the Federal Rules of Evidence in several respects. The Court DENIES Plaintiffs' Motion but notes that the Court his given appropriate weight to all of the evidence in the record, considering, inter *1176 alia, whether individual items of evidence are admissible or inadmissible.

IV. SUMMARY

The Court GRANTS the Defendants' Motion to Supplement [52-1] their Motion for Summary Judgment. The Court GRANTS the Plaintiffs' Motion to Supplement [63-1] their Response to Defendants' Motion for Summary Judgment. The Court DENIES the Plaintiff's Motion to Strike [62-1] the Affidavit of Linda Doster, or in the alternative Not to Consider [62-2] the Affidavit. The Court GRANTS the Plaintiff's Motion to Supplement the Record [66-1].
For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART the Defendants' Motion for Summary Judgment [51-1]. The Court GRANTS the Defendants' Motion for Summary Judgment on the Plaintiffs' conspiracy claims, the Plaintiffs' claims for denial of access to the courts, all claims by the Plaintiff Clayton Miller in his individual capacity, the Plaintiffs' substantive due process claims against Defendant Whitney, and all of the Plaintiffs' claims under state law. The Court DENIES the Defendants' Motion for Summary Judgment with respect to the Plaintiffs' substantive due process section 1983 claims against Defendant Spooner.
The Court directs the parties to submit a Consolidated Pre-Trial Order no later than 30 days from the date of this Order. The case will be placed on the Court's next available trial calender.
NOTES
[1] On September 3, 1997, the Plaintiffs voluntarily dismissed all claims against Defendants Louie and Diane Weaver, and thereby dismissed all claims of Plaintiff Amanda Miracle.
[2] Lizann and Samuel are the only children to take their father's surname, Miller. The surname of the other five children is Miracle, their mother's surname.
[3] There is also deposition testimony that Defendant Spooner similarly treated other foster children and parents. For several weeks prior to Clayton's death, other foster parents complained to Defendant Spooner's supervisor that she was not making the required home visits and refused to return any telephone calls.
[4] The Defendants note that DFACS employee Linda Doster, a specialist in the State Office Foster Care Unite whose duties include policy development, opines that the practice of placing a child in a cold shower does not meet the definition of abuse and is not specifically identified as a "prohibited practice" in the Foster Parent Manual. However, Doster testified that the practice "was not an acceptable method" to control a child's temper.
[5] There are cases that emphasize the involuntary nature of the custody proceedings as relevant to the determination of the state's duty to protect the child. See e.g., Milburn by Milburn v. Anne Arundel County Dep't of Social Servs., 871 F.2d 474, 476 (4th Cir.), cert. denied, 493 U.S. 850, 110 S.Ct. 148, 107 L.Ed.2d 106 (1989); Walton v. Alexander, 44 F.3d 1297, 1303-04 (5th Cir. 1995) (en banc).
[6] The Court already has granted the Defendants' Motion for Summary Judgment on Plaintiffs' access to the courts claims and conspiracy claims against all the Defendants, and Plaintiffs' substantive due process claims against Defendant Whitney. The substantive defense of qualified immunity also applies to these claims. See Burrell v. Board of Trustees of Ga. Military Coll., 970 F.2d 785, 792 (11th Cir.1992) ("Without a constitutional violation, there can be no violation of a clearly established constitutional right."). Thus, as an alternative ground, the Court concludes that the Defendants are entitled to summary judgment on these claims based upon qualified immunity.